# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

SUCESORES DE DON CARLOS
NUÑEZ Y DOÑA PURA GALVEZ,
INC., d/b/a BANCO NUÑEZ,

    Plaintiff,

vs.

**JURY DEMAND**

SOCIÉTÉ GÉNÉRALE, S.A., d/b/a
SOCIÉTÉ GÉNÉRALE AMERICAS,

    Defendant.
_____/

## COMPLAINT

Plaintiff Sucesores de Don Carlos Nuñez y Doña Pura Galves, Inc., d/b/a Banco Nuñez ("Plaintiff"), sues Société Générale, S.A., d/b/a Société Générale Americas ("SocGen"), for violations of the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et seq.* ("Helms-Burton"), and states:

## INTRODUCTION

1. In 1961, the sole owners of Banco Nuñez,[1] Carlos and Pura Nuñez (the "Founders"), fled Cuba to escape the extrajudicial killings, unjustified imprisonment, and cruelty that would come to embody Fidel Castro's reign.

2. Before Castro came to power, Banco Nuñez was a flourishing enterprise. Between 1921 and 1958, the Founders grew Banco Nuñez into a twenty-two branch banking operation

---

[1] The entity as it existed in Cuba on December 31, 1958, is referred to as "Banco Nuñez." The Floridian entity holding a claim associated with Banco Nuñez is referred to as "Plaintiff."

with a physical presence in five of Cuba's six provinces. The Founders also owned the land on which Banco Nuñez built its branches, through an entity called Inmobiliaria Norka, S.A. ("Norka").

3. As of December 31, 1958, Banco Nuñez was the second largest Cuban-owned bank on the island in terms of assets and equity.[2] It controlled $105.1 million in assets, including $51.5 million in loans, and had equity of $7.8 million.[3]

4. In 1960, Castro's Cuban Government began nationalizing every banking institution on the island and absorbing them into the state-controlled entity Banco Nacional de Cuba ("BNC"). First, on September 17, 1960, under the auspices of Law 851, the Cuban Government confiscated all United States-owned banking operations in Cuba, including: National City Bank, Chase Manhattan Bank, and First National Bank of Boston.[4] All of those entities, including their physical branches, were subsumed into BNC.

5. On October 14, 1960, all Cuban-owned banks, including Banco Nuñez, were nationalized and absorbed into BNC in conformance with Law 891.[5] For the next thirty-seven years, BNC was the island's sole banking institution,[6] and to this day, BNC and its subsidiaries maintain possession of Banco Nuñez's physical branches.

---

[2] *See* December 31, 1958, *Esta Era la Banca de Cuba a la Llegada del Comunismo*, attached hereto as **Exhibit 1**.
[3] *Id*. From 1948 to 1958, the Cuban peso traded at par with the U.S. dollar. *See* Armando M. Lago and Jose Alonso, *A First Approximation Model of Money, Prices and Exchange Rates in Revolutionary Cuba*, Association for the Study of the Cuban Economy, available at: https://www.ascecuba.org/asce_proceedings/a-first-approximation-model-of-money-prices-and-exchange-rates-in-revolutionary-cuba/ (last visited May 1, 2019).
[4] Raul Shelton, *The Historical Development of the Cuban Banking System: Lessons for the Future*, Association for the Study of the Cuban Economy, available at: https://www.ascecuba.org/asce_proceedings/the-historical-development-of-the-cuban-banking-system-lessons-for-the-future/ (last visited May 30, 2019).
[5] *Id*.
[6] Lorena Barberia, *Remittances to Cuba: An Evaluation of Cuban and US Government Policy Measures*, p. 21 September 2002, available at: http://balseros.miami.edu/pdf/15_remittances.pdf (last visited May 30, 2019).

6. BNC, an alter ego of the Cuban Government,[7] was forged with the confiscated assets of every then-existing banking institution on the island. On October 14, 1958, BNC had a "fair value" equivalent to the equity that BNC confiscated from the Cuban banking industry—approximately $74 million.[8]

7. $7.8 million, approximately ten-and-one-half percent, of BNC's value as of October 14, 1958, was stolen from Banco Nuñez. The $7.8 million valuation of Banco Nuñez corresponds to the book value of its equity as of December 31, 1958.[9]

8. BNC should have paid the Founders the fair value of Banco Nuñez at the time of confiscation. BNC could have done so with cash, but it did not. In the absence of a cash transfer, or any other form of payment, BNC should have paid the Founders with BNC stock.

9. Because Plaintiff has never been paid for its loss, Plaintiff owns a claim to ten-and-one-half percent of the equity of BNC.[10] To be clear, the "property"[11] at issue in this matter is Plaintiff's claim to ten-and-one-half percent of the equity of BNC.

10. SocGen is liable to Plaintiff for "trafficking"[12] because it conducts commercial activities with BNC and derives profits therefrom.[13]

---

[7] Helms-Burton defines the "Cuban Government" as "any political subdivision of Cuba, and any agency or instrumentality of the Government of Cuba." 22 U.S.C. § 6023(5)(A). United States Courts recognize BNC as an alter ego of the Republic of Cuba. *See Banco Nacional de Cuba v. First Nat. City Bank of New York*, 478 F.3d 191, 193 (2d Cir. 1973).

[8] *See* **Exhibit 1**.

[9] *Id*.

[10] Banco Nuñez's claim to the equity of BNC is analogous to the ownership structure of the National Bank of Belgium ("NBB"), which was established in 1850 using private capital alone. In 2019, fifty percent of NBB's shares remain publicly held, with public shareholders entitled to dividends and voting rights. *See* National Bank of Belgium, *Market Releases*, available at: https://www.nbb.be/en/about-national-bank/shareholder-information/market-releases-0 (last visited May 30, 2019).

[11] "Property" means "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein." 22 U.S.C. § 6023(12)(A).

[12] An entity "traffics" in confiscated property if it knowingly and intentionally (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property or purchases, leases, receives, possesses, obtains, control of, manages, uses, or otherwise acquires or holds an interest in confiscated property, (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or (iii) causes, directs, participates in,

3

11. In or around 2000, SocGen created a system of "credit facilities" to enable BNC to circumvent the United States' economic embargo of Cuba. SocGen's system involved concealing and processing BNC's transactions with foreign corporations, and in exchange for this service, SocGen received over $1 billion in profit.

12. Through this "credit facility" system, SocGen "knowingly and willfully" violated the Trading with the Enemy Act ("TWEA"), 50 U.S.C. §§ 4303, 4305, and 4315(a), and the Cuban Assets Control Regulations ("CACR"), 31 C.F.R. §§ 515.201(a)(1), (c), and (d), promulgated under the TWEA.[14] SocGen's facilities "provided funding to a Cuban government bank," BNC, "to Cuban government-controlled corporations, and to European corporations in connection with their Cuban business enterprises. The facilities included loans secured by Cuban tax revenues, sugar, oil, and nickel."[15] SocGen trafficked in Plaintiff's property by, and on behalf of, BNC, processing transactions worth over $15 billion through SocGen's Cuban credit facilities.[16]

13. By engaging in commercial activity with BNC, SocGen received a profit of $1.34 billion.[17] Because Banco Nuñez retains a claim to ten-and-one-half percent of BNC, SocGen's activities constitute "trafficking" in Banco Nuñez's "property," as defined by Helms-Burton.[18]

---

or profits from trafficking, without the authorization of the United States National who holds a claim to the property. *See* 22 U.S.C. §§ 6082 and 6023(13).
[13] *See* 22 U.S.C. § 6082.
[14] *See* Verified Complaint for Forfeiture, *U.S. v. $717,200,000 in U.S. Currency*, Case No.: 18-cv-10783 (S.D.N.Y.), [DE 1, ¶¶ 4, 6], attached hereto as **Exhibit 2**.
[15] *See* **Exhibit 2**, [DE 1-1, Exhibit C, ¶ 21].
[16] *See* **Exhibit 2**, [DE 1-1, Exhibit C, ¶¶ 22, 23, 25].
[17] *See* **Exhibit 2**, [DE 1-1, Exhibit 1, ¶ 4].
[18] Moreover, as of December 31, 1959, Banco Nuñez owned shares of BNC with a then current fair value of $194,900. *See* December 31, 1959 balance sheet attached hereto as **Exhibit 3**. Banco Nuñez has never been compensated for that lost asset, and therefore alternatively possesses a direct claim on the equity of BNC.

14. Plaintiff seeks monetary damages, including treble damages,[19] and court costs and attorneys' fees from SocGen for trafficking in the assets of Banco Nuñez in violation of Title III of Helms-Burton.

## PARTIES AND RELEVANT NONPARTIES

15. Plaintiff, Sucesores de Don Carlos Nuñez y Doña Pura Galves, Inc., d/b/a Banco Nuñez, is a Florida corporation. The Founders owned one-hundred percent of the equity of Banco Nuñez as it existed on December 31, 1958. Founder Carlos Nuñez, who was preceded in death by his wife, Pura, became a United States citizen before he passed away on October 31, 1979. In 1996, the Founders' children and their families created Plaintiff to consolidate, unify and hold one-hundred percent of the claim associated with Banco Nuñez—all of which had been inherited from Founder Carlos Nuñez.

16. The Founders also owned one-hundred percent of the equity of Inmobiliaria Norka, S.A., which held the land on which Banco Nuñez built its branches. In 1996, the claim associated with Inmobiliaria Norka, S.A., was consolidated and unified into Plaintiff.

17. Defendant Société Générale, S.A., is a French multinational investment bank and financial services company headquartered in Paris, France. Société Générale, S.A. does business in the United States as Société Générale Americas, a Delaware corporation with its headquarters at 245 Park Avenue, New York, New York 10167.

18. The Republic of Cuba, a nonparty to this case, is a sovereign state comprising the island of Cuba, as well as Isla de la Juventud and several minor archipelagos. In May 1959, the Cuban Agrarian Reform Law began the process of expropriating property from private ownership into the hands of the Cuban Government. Law No. 851 gave Fidel Castro and

---

[19] SocGen received Plaintiff's demand letter, as required by 22 U.S.C. § 6082(a)(3), on June 10, 2019. This complaint was filed thirty days thereafter.

5

Osvaldo Doritcós Torrado the power to decree joint resolutions to nationalize American properties in Cuba by compulsory expropriation. Law No. 890 established the Cuban nationalization of companies dealing in sugar, spirits, beverages, soap, perfume, milk products, chemicals, maritime transportation, railway communications, coffee, and drugs, among other industries, irrespective of the owners' nationality. Law No. 891 declared banking a public function, while Law No. 1076 nationalized small retail forms of commerce, also irrespective of the former owners' nationality.

19.    Banco Nacional de Cuba, a nonparty to this case, is an alter ego of the Republic of Cuba.[20] On October 14, 1960, Banco Nacional de Cuba nationalized Banco Nuñez without paying any compensation to the Founders. Between 2000 and 2014, Banco Nacional de Cuba and SocGen conducted business activities, including the maintenance and operation of several credit facilities, which generated over $1 billion in profit for SocGen.

## JURISDICTION AND VENUE

20.    Plaintiff is a Florida corporation located at 9700 NW 79th Avenue, Hialeah Gardens, Florida 33016. A United States national, Plaintiff has been the victim of confiscation by the Cuban Government, and is "endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures."[21]

21.    Defendant, Société Générale, S.A., is a multinational bank headquartered at 29 Blvd. Haussman, 9th Arrondissement, Paris, France. SocGen does business in the United States through its wholly owned subsidiary Société Générale Americas, headquartered at 245 Park Avenue, New York, New York 10167.

---

[20] *See Banco Nacional de Cuba*, *supra* n.7.
[21] 22 U.S.C. § 6081(11).

22. Plaintiff brings a claim for relief pursuant to Helms-Burton, and this Court has federal question jurisdiction over this matter in accordance with 28 U.S.C. § 1331.

23. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiff's claim occurred in this jurisdiction.

## FACTUAL ALLEGATIONS

### I. Plaintiff Owns a Claim Associated with Banco Nuñez.

24. Banco Nuñez commenced operations in 1921. Over the next forty years, the Founders grew Banco Nuñez into the second largest Cuban-owned bank on the island.[22] As of December 31, 1958, Banco Nuñez had twenty-two branches, $105.1 million in assets, including $51.5 million in loans, and equity of $7.8 million.[23]

25. On December 31, 1958, Banco Nuñez owned branches, and through Norka, the land, located at:

    i. Mercaderes Nº 260, Havana (Banco Nuñez's headquarters);

    ii. Aguiar y Obrapia, Havana;

    iii. Maximo Gomez Nº 816, Havana;

    iv. 10 do Octubre Nº 958, Havana;

    v. Terminal de Autobuses, Havana;

    vi. Calle 26 y 45, Havana;

    vii. 5ta. Avenida y Avda. 112, Havana;

    viii. Maceo Nº 853, Provincia de la Havana;

    ix. Cisneros Nº 224, Camagüey;

---

[22] *See* **Exhibit 1**.
[23] *Id.*

    x.    Independencia Nº 152, Camagüey;

    xi.    Florida, Camagüey;

    xii.    Cespedes Nº 94, Matanzas;

    xiii.    Independencia Nº 50, Matanzas;

    xiv.    Maceo y Aguilera, Oriente;

    xv.    Jose A. Saco Nº 170, Oriente;

    xvi.    Vicente Garci Aguilera Nº 102, Oriente;

    xvii.    Bayamo, Oriente;

    xviii.    Gibra, Oriente;

    xix.    Manzanillo, Oriente;

    xx.    Guantanamo, Oriente;

    xxi.    Palma Soriano, Santiago; and

    xxii.    P. Vidal Nº 1, Las Villas.

26.    After fleeing Cuba in 1960, Founder Carlos Nuñez died in the United States on October 31, 1979. In conformance with his last will and testament, dated September 28, 1974, Founder Carlos Nuñez's one-hundred percent claim to the equity and assets of Banco Nuñez (and by extension, his claim to the equity of BNC) passed in eight equal shares to his children, or *per stirpes* to the families of Mr. Nuñez's three children who had preceded him in death.

27.    In 1996, the individuals who had inherited claims to Banco Nuñez formed Plaintiff to hold and preserve a unified claim.

28.    The individuals who transferred their interests in Banco Nuñez to Plaintiff were:

    i.    Nestor Nuñez Galvez;

    ii.    Blanco Nuñez Galvez;

      iii.     Dagmar Hidalgo Nuñez;

      iv.     Gloria Torralbas Nuñez;

      v.     Tomas Torralbas Nuñez;

      vi.     Pura America Ochoa Nuñez;

      vii.     Elsa Ochoa Molina;

      viii.     Norka Cabanas Nuñez;

      ix.     Carlos Cabanas Nuñez;

      x.     Silvia Nuñez Tarafa;

      xi.     Carlos Nuñez Tarafa;

      xii.     Alejandro Nunez Tarafa;

      xiii.     Caridad Maria Rivero Caballero; and

      xiv.     Carlos Arsenio Nuñez Rivero.

29. As the holder of one-hundred percent of the equity of Banco Nuñez and Norka, and by extension, a claim to ten-and-one-half percent of the equity of BNC, Plaintiff is entitled to relief under Title III of Helms-Burton from any entity "trafficking" in its "property."

**II. In 1959, the Value of Banco Nuñez Exceeded $50,000.**

30. On October 14, 1960, Banco Nuñez was worth at least $7.8 million.[24]

31. The Foreign Claim Settlement Commission ("FCSC") of the United States Cuban Claims Program certified a dollar value for analogous claims under the auspices of Title V of the International Claims Settlement Act of 1949, 22 U.S.C. § 1643, *et seq*.

32. Employing the FCSC reasoning from CU-1615, because the Founders controlled one-hundred percent of Banco Nuñez's outstanding shares, the value of Plaintiff's claim can

---

[24] *See* 22 U.S.C. § 6082(b).

simply be calculated as Banco Nuñez's equity at the time of loss: $7.8 million in 1958.[25]

33. The Founders were not eligible to file claims with the FCSC because they were not United States citizens at the time their property was confiscated.[26] Nonetheless, the value of Plaintiff's claim is well in excess of Helms-Burton's $50,000 threshold.

### III. Expropriation of Plaintiff's Property by the Cuban Government.

34. On December 31, 1958, Banco Nuñez operated twenty-two physical locations, owned $105 million in assets, including $51.5 million in loans, and had equity of $7.8 million.[27] At the time of confiscation, Banco Nuñez represented roughly ten percent of all banking activity conducted on the island, including bank operations controlled by foreign institutions.

35. On October 14, 1960, the Cuban Government issued Law 891, immediately nationalizing all Cuban-owned banks on the island, including Banco Nuñez, and absorbing them into the Cuban Government's alter ego, BNC.[28]

36. Between October 14, 1960 and December 31, 1961, the Founders, their children, and their children's families fled Cuba and immigrated to the United States.

37. The Castro regime confiscated Banco Nuñez's property without the Founders' consent. Today, the Cuban Government continues to maintain possession of Banco Nuñez's assets, including its physical branches, and continues to conduct banking activity from those locations.[29]

---

[25] *See* analogous certified claim of Elmer E. and Isabel Keller, CU-1615, attached hereto as **Exhibit 4** (their shares of Industrial Bank could be valued by the bank's "owners' equity, or net worth," divided by the bank's outstanding shares as of December 31, 1959.).
[26] *See* 22 U.S.C. § 1643.
[27] *See* **Exhibit 1.**
[28] Shelton, *The Cuban Banking System*, *supra* n.4.
[29] *See* current photograph of Mercaderes Nº 260, Havana, a building that used to be Banco Nuñez's headquarters, attached hereto as **Exhibit 5**. The building is currently occupied by Banco de Credito y Comercio, a division of BNC created on November 12, 1997, to develop "universal functions inherent to commercial banking, both for operations in the national territory and abroad." (citing Banco Central de Cuba, Banco de Credito y Comercio, available at: http://www.bc.gob.cu/institucion/bancaria/17 (last visited May 9, 2019)).

38. Banco Nuñez was entirely absorbed into BNC, and the Cuban Government failed to pay the Founders for the equity of Banco Nuñez, either with cash or with equity in BNC. Consequently, Plaintiff asserts a claim for ten-and-one-half percent of the equity of BNC—an amount equivalent to the percentage of the Cuban banking industry controlled by Banco Nuñez at the time the entire industry was nationalized by BNC.

39. Presently, BNC acts as conduit for the Cuban Government to conduct commercial activities with foreign corporations. Those transactions are processed through "credit facilities" provided by foreign financial institutions like SocGen.

**IV. Enactment of the Economic Embargo of Cuba and Helms-Burton.**

40. Since Fidel Castro seized power in Cuba in 1959, the Cuban Government has trampled on the fundamental rights of the Cuban people and confiscated the property of millions of its own citizen, thousands of United States nationals, and thousands more Cubans who claimed asylum in the United States as refugees because of Castro's persecution.[30]

41. The Cuban Government's wrongful confiscation or taking of property, and its subsequent exploitation of this property at the expense of the right owner, "undermines the comity of nations, the free flow of commerce, and economic development."[31] To deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations are, through Title III of Helms-Burton, "endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures."[32]

42. Title III of the Helms-Burton Act provides that any person who traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be

---

[30] *See* 22 U.S.C. § 6081(3).
[31] 22 U.S.C. § 6081(2).
[32] 22 U.S.C. § 6081(11).

11

liable to the United States national who owns a claim to that property for monetary damages.[33] "United States national" means any United States citizen or any other legal entity organized under the laws of the United States, or of any State.[34] A person "traffics" in confiscated property if that person knowingly and intentionally: (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses or otherwise acquires or holds an interest in confiscated property; (ii) engages in a commercial activity using or otherwise benefiting from confiscated property; or (iii) causes, directs, participates in, or profits from trafficking, or otherwise engages in trafficking.[35]

43. Banco Nuñez was confiscated on October 14, 1960. The Founders' children and their families inherited their interest in Banco Nuñez prior to March 12, 1996. To consolidate and preserve a unified claim, all of the Founders' children and their families transferred their claims associated with Banco Nuñez to Plaintiff. Plaintiff owns a claim to ten-and-one-half percent of the equity of BNC. Any company that profits from its dealings with BNC "traffics" in Plaintiff's "property."[36]

### V. SocGen Trafficked in Plaintiff's Property.

44. From at least 2000 up through and including 2010, SocGen knowingly and willfully violated the economic embargo of Cuba,[37] specifically the TWEA, 50 U.S.C. §§ 4303,

---

[33] *See* 22 U.S.C. § 6082(a).
[34] *See* 22 U.S.C. § 6023(15).
[35] *See* 22 U.S.C. § 6023(13).
[36] *See* 22 U.S.C. § 6082(a)(1).
[37] SocGen, "having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, employees, or others authorized to speak on its behalf, make any statement to any person outside of [SocGen], in litigation or otherwise, contradicting the Statement of Facts" or the Deferred Prosecution Agreement entered into with the United States Government on November 18, 2018. *See* **Exhibit 2** [DE 1-1, Exhibit 1, at ¶ 17].

12

4305, and 4315(a), and the CACRs promulgated thereunder, including 31 C.F.R. §§ 515.201(a)(1), (c) and (d).[38]

45. Specifically, SocGen structured, conducted, and concealed transactions between Cuban banks, including BNC, other entities controlled by the Cuban Government, and foreign corporations.[39] These transactions were carried out through a series of "credit facilities" provided by SocGen's Natural Resources and Energy Financing department.[40]

46. Each transaction between BNC and a third party constitutes trafficking in Plaintiff's expropriated property, and through its credit facilities, SocGen engaged in more than $10 billion worth of improper transactions.[41]

47. As an example of how SocGen's credit facility system operated, in 2000, SocGen created two linked facilities to finance oil transactions between a Dutch commodities firm and Cuba Petóleo Union (a Cuban Government-owned corporation).[42] One of those two facilities was a $40 million revolving line of credit to finance the Dutch company's importation of crude oil into Cuba, where it was refined by Cuba Petóleo Union and sold to the local Cuban market.[43] The second linked facility was a $40 million revolving line of credit to finance the Dutch company's purchase of receivables owed to Cuba Petóleo Union from the sale of refined gasoline.[44]

---

[38] *See* **Exhibit 2**, [DE 1, ¶ 4].
[39] *See* **Exhibit 2**, [DE 1-1, Exhibit C, ¶ 12].
[40] *See Id*. at ¶¶ 6, 15.
[41] *Id*. at ¶ 6.
[42] *See* **Exhibit 2**, [DE 1, Exhibit C, ¶ 22].
[43] *Id*.
[44] *Id*.

48. Between 2003 and 2010, SocGen engaged in 1,887 transactions involving the sale of crude oil and the subsequent purchase of affiliated receivables.[45] The aggregate dollar value of those transactions was $14,736,500,000.[46]

49. During this same timeframe, SocGen maintained twenty additional credit facilities for the benefit of BNC, the Cuban Government, and foreign corporations doing business in Cuba.

50. Six of SocGen's facilities were comprised of loans directly from SocGen to BNC. Three of those loans to BNC were secured by Cuban commodities, and the other three were repaid by a different Cuban bank using Cuban tax revenues.

51. Another SocGen facility involved loans extended directly from SocGen to Cubana de Aviación (a Cuban state-owned corporation that operates Cuba's airlines).[47]

52. Thirteen of SocGen's credit facilities involved loans to European corporations. These facilities allowed the European companies to finance the purchase, production, and/or export of Cuban commodities.[48]

53. SocGen went to great lengths to conceal its trafficking (SocGen's "Concealment Practices"). For example, a January 2006 agreement involving a credit facility between SocGen and BNC expressly stated that the payments between SocGen and a Russian bank that was a sub-participant in the facility should be made through SocGen New York "without including any mention or reference to Cuba, any Cuban entity or to the Caribbean, either in the correspondence (electronic, paper or fax), the SWIFT messages or the fund transfer SWIFTS."[49] In another

---

[45] *Id.*
[46] *Id.*
[47] *Id.* at ¶ 23.
[48] *Id.* at ¶ 23.
[49] *Id.* at ¶ 36 (emphasis removed).

14

example, in July 2002, SocGen described a proposed credit facility involving a joint venture between a French commodities trading company and a Cuban government entity as follows:

> We are going to receive transfer orders in USD in favor of certain suppliers in non-Cuban banks. In this case, the USD transfer must not in any case mention the name of the ordering party [the joint venture] or its country of origin, Cuba. The clearing will indeed be carried out in NY. I have explicitly asked [the joint venture] to write on its transfer request the instructions to be included."[50]

54. At some point in 2010, SocGen made a decision to cease U.S. dollar denominated credit facilities in Cuba, and to replace them with Euro-denominated facilities.[51] The new Euro-denominated facilities were created no later than October 2010.[52]

55. Upon information and belief, SocGen continues, to this day, to profit from Euro-denominated credit facilities and transactions involving BNC.

56. For Plaintiff's losses attributable to the Cuban Government's expropriation of Banco Nuñez, Plaintiff seeks damages from SocGen in accordance with § 6082(a) of Helms-Burton.

## TOLLING OR NON-ACCRUAL OF STATUTE OF LIMITATIONS

57. Upon information and belief, SocGen presently operates credit facilities, denominated in Euros, and continues to profit from commercial activities with BNC.

58. Notwithstanding SocGen's continuing violations of Title III of Helms-Burton, between 2000 and 2010, as admitted by SocGen, it knowingly and intentionally profited by trafficking in Plaintiff's confiscated property, while at the same time employing a variety of Concealment Practices and to prevent discovery by OFAC and other regulatory agencies.[53]

---

[50] *See* **Exhibit 2**, [DE 1, Exhibit, C, at ¶ 15] (emphasis removed).
[51] *Id.* at ¶ 33.
[52] *Id.* at ¶ 39.
[53] *Id.* at ¶ 14.

59. Plaintiff did not and could not have discovered the facts constituting SocGen's violations of Helms-Burton until the United States' complaint was made available to the public on November 19, 2018.

60. SocGen concealed its own wrongdoing, and failed to even report its Cuban-derived profits to OFAC, until October 2014.[54]

61. Because Plaintiff could not have reasonably discovered the facts constituting Defendant's violations until November 19, 2018, their claims accrued on that date and all applicable statutes of limitations were tolled until that date.

## COUNT I
## Liability for Trafficking According to Helms-Burton

Plaintiff re-alleges and incorporates paragraphs 1-61 above as if fully set forth herein and further alleges as follows:

62. Title III of the Helms-Burton Act provides that any person who traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for monetary damages.

63. The Founders owned one-hundred percent of the equity of Banco Nuñez as it existed on December 31, 1958. When the Cuban Government expropriated Banco Nuñez on October 14, 1960, its fair value was at least $7.8 million.

64. Upon Founder Carlos Nunez's death in 1979, the claim to Banco Nuñez was inherited by his family. In 1996, all of the family members who had inherited claims to Banco Nuñez formed Plaintiff to unify and hold the claim associated with Banco Nuñez.

65. SocGen is trafficking in Plaintiff's property. Banco Nuñez was entirely absorbed into BNC, and the Cuban Government failed to pay the Founders for the equity of Banco Nuñez,

---

[54] *Id.* at ¶41.

either with cash or with equity in BNC. Consequently, Plaintiff maintains a claim to ten-and-one-half percent of the equity of BNC—an amount equivalent to the percentage of the Cuban banking industry controlled by Banco Nuñez at the time the entire industry was nationalized by BNC.

66. Between 2000 and 2010, through various credit facilities, SocGen processed thousands of transactions and earned hundreds of millions in dollars in fees by conducting commercial activities with BNC.

67. SocGen generated at least $1.34 billion in profit from "trafficking" – i.e. conducting commercial activities with BNC, the successor in interest to Banco Nuñez.

68. After years of concealment, SocGen's trafficking in Banco Nuñez's expropriated property became public knowledge on November 19, 2018.

69. Plaintiff seeks to hold SocGen accountable under Title III of Helms-Burton for actions that resulted in the United States Department of Justice finding SocGen liable under the TWEA and CACR.

70. Moreover, Plaintiff seeks to hold SocGen liable under Title III of Helms-Burton for continuing to conduct Euro-denominated transactions with BNC through the present day.

71. Plaintiff provided a thirty-day notice to SocGen on June 10, 2019, stating Plaintiff's intention to commence this action and demanding that SocGen's unlawful trafficking cease immediately.[55] As of the date of this Complaint, SocGen continues its unlawful trafficking of Plaintiff's property.

Accordingly, Plaintiff respectfully requests that the Court: (1) enter judgment against SocGen for monetary damages in accordance with § 6082(a), including treble damages; (2)

---

[55] *See* 22 USC § 6082(a)(3)(B) and 22 USC § 6082(a)(3)(D)(iii).

award Plaintiffs' attorneys' fees and costs in accordance with § 6082(a)(1)(A)(ii); and (3) for any further relief deemed appropriate by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: July 10, 2019.                    Respectfully submitted,

**KOZYAK TROPIN & THROCKMORTON, LLP**
*Counsel for Plaintiff*
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

By: /s/
Javier A. Lopez, Esq.
Florida Bar No. 16727
jal@kttlaw.com
Stephanie M. Gomez, Esq.
Florida Bar No. 112095
sgomez@kttlaw.com
Evan J. Stroman, Esq., CPA
Florida Bar No. 118929
estroman@kttlaw.com