## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 19-CV-22842-DPG

SUCESORES DE DON CARLOS
NUÑEZ Y DOÑA PURA GALVEZ,
INC., d/b/a BANCO NUÑEZ,

      Plaintiff,

                                   **JURY DEMAND**

vs.

SOCIÉTÉ GÉNÉRALE, S.A., d/b/a
SG AMERICAS, INC.; THE BANK OF
NOVA SCOTIA, d/b/a SCOTIA
HOLDINGS (US) INC., a/k/a THE BANK
OF NOVA SCOTIA, MIAMI AGENCY;
THE NATIONAL BANK OF CANADA,
d/b/a NATIONAL BANK OF CANADA
FINANCIAL GROUP, INC.; and BANCO
BILBAO VIZCAYA ARGENTARIA, S.A.,
d/b/a BBVA, USA.,

      Defendants.
_____/

## AMENDED COMPLAINT

Plaintiff Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc., d/b/a Banco Nuñez

("Plaintiff"), sues Société Générale, S.A., d/b/a SG Americas, Inc. ("SocGen"); The Bank of

Nova Scotia, d/b/a Scotia Holdings (US) Inc., a/k/a The Bank of Nova Scotia, Miami Agency

("Scotibank"); The National Bank of Canada, d/b/a National Bank of Canada Financial Group,

Inc. ("NatBC"); and Banco Bilbao Vizcaya Argentaria, S.A., d/b/a BBVA, USA ("BBVA")

(collectively, "Defendants"), for violations of the Cuban Liberty and Democratic Solidarity Act,

22 U.S.C. § 6021, *et seq.* ("Helms-Burton"), and states:

## INTRODUCTION

1.      In 1961, the sole owners of Banco Nuñez,[1] Carlos and Pura Nuñez (the "Founders"), fled Cuba to escape the extrajudicial killings, unjustified imprisonment, and cruelty that would come to embody Fidel Castro's reign.

2.      Before Castro came to power, Banco Nuñez was a flourishing enterprise. Between 1921 and 1958, the Founders grew Banco Nuñez into a twenty-two branch banking operation with a physical presence in five of Cuba's six provinces. The Founders also owned the land on which Banco Nuñez built its branches, through an entity called Inmobiliaria Norka, S.A. ("Norka").

3.      As of December 31, 1958, Banco Nuñez was the second largest Cuban-owned bank on the island in terms of assets and equity.[2] It controlled $105.1 million in assets, including $51.5 million in loans, and had equity of $7.8 million.[3]

4.      In 1960, Castro's Cuban Government began nationalizing every banking institution on the island and absorbing them into the state-controlled entity Banco Nacional de Cuba ("BNC"). First, on September 17, 1960, under the auspices of Law 851, the Cuban Government confiscated all United States-owned banking operations in Cuba—National City

---

[1] The entity as it existed in Cuba on December 31, 1958, is referred to as "Banco Nuñez." The Floridian entity holding a claim associated with Banco Nuñez is referred to as "Plaintiff."

[2] *See* December 31, 1958, *Esta Era la Banca de Cuba a la Llegada del Comunismo*, attached hereto as **Exhibit 1**. Despite confiscation of the banks identified by this document taking place in 1960, the 1958 document is referred to throughout the Amended Complaint because the banks' values did not materially change between 1958 and 1960.

[3] *Id*. From 1948 to 1958, the Cuban peso traded at par with the U.S. dollar. *See* Armando M. Lago and Jose Alonso, *A First Approximation Model of Money, Prices and Exchange Rates in Revolutionary Cuba*, Association for the Study of the Cuban Economy, available at: https://www.ascecuba.org/asce_proceedings/a-first-approximation-model-of-money-prices-and-exchange-rates-in-revolutionary-cuba/ (last visited May 1, 2019).

Bank, Chase Manhattan Bank, and First National Bank of Boston.[4] All of those entities, including their physical branches, were subsumed into BNC.

5.     On October 14, 1960, all Cuban-owned banks, including Banco Nuñez, were nationalized and absorbed into BNC in conformance with Law 891.[5] At that time, the function of BNC was converted from operating as Cuba's central bank, to operating as Cuba's sole financial institution with the responsibility to conduct or oversee all monetary policy, commercial banking, borrowing, and lending processes in Cuba. For the next thirty-seven years, BNC was the island's sole banking institution,[6] and to this day, BNC and its affiliates maintain possession of Banco Nuñez's physical branches.

6.     BNC, an alter ego of the Cuban Government,[7] was merged with the confiscated assets of every then-existing banking institution on the island. On October 14, 1960, BNC had a

---

[4] Raul Shelton, *The Historical Development of the Cuban Banking System: Lessons for the Future*, Association for the Study of the Cuban Economy, available at: https://www.ascecuba.org/asce_proceedings/the-historical-development-of-the-cuban-banking-system-lessons-for-the-future/ (last visited May 30, 2019).

[5] *Id.*

[6] Lorena Barberia, *Remittances to Cuba: An Evaluation of Cuban and US Government Policy Measures*, p. 21 September 2002, available at: http://balseros.miami.edu/pdf/15_remittances.pdf (last visited May 30, 2019). In 1998, pursuant to Law No. 181, BNC was released from its function as the Central Bank of Cuba and was instead "maintained as a commercial bank," and functioned as the regulator of "external debt that the [Cuban] State and the BNC itself have contracted with foreign creditors with the guarantee of the [Cuban] State. *See* EcuRed, *National Bank of Cuba*, available at https://www.ecured.cu/Banco_Nacional_de_Cuba (last visited September 3, 2019). EcuRed is a Cuban state-operated website and content can only be published "with prior approval from EcuRed administrators." *See* Reuters, *Cuba Launches Wikipedia-like Online Encyclopedia*, December 13, 2010, available at: https://www.reuters.com/article/us-cuba-internet-encyclopedia/cuba-launches-wikipedia-like-online-encyclopedia-idUSTRE6BD02E20101214 (last visited September 12, 2019).

[6] *Id.*

[7] Helms-Burton defines the "Cuban Government" as "any political subdivision of Cuba, and any agency or instrumentality of the Government of Cuba." 22 U.S.C. § 6023(5)(A). United States Courts recognize BNC as an alter ego of the Republic of Cuba. *See Banco Nacional de Cuba v. First Nat. City Bank of New York*, 478 F.3d 191, 193 (2d Cir. 1973).

"fair value" roughly equivalent to the equity that BNC confiscated from the Cuban banking industry—approximately $74 million.[8]

7.     $7.8 million, approximately ten-and-one-half percent of BNC's value as of October 14, 1958, was stolen from Banco Nuñez by BNC. The $7.8 million valuation of Banco Nuñez corresponds to the book value of its equity as of December 31, 1958.[9]

8.     BNC should have paid the Founders the fair value of Banco Nuñez at the time of confiscation. BNC did in fact purchase, for cash, two Canadian financial institutions operating in Cuba in 1958—Scotiabank and The Royal Bank of Canada ("RBC")—and BNC paid the Canadian banks at least the 1958 book value of their Cuban enterprises.[10] BNC could have purchased Banco Nuñez with cash, but it did not. In the absence of a cash transfer, or any other form of payment, BNC should have paid the Founders with BNC stock.

9.     Because Plaintiff has never been paid for its loss, Plaintiff owns a claim to ten-and-one-half percent of the equity of BNC.[11] To be clear, the "property"[12] at issue in this matter is Plaintiff's claim to ten-and-one-half percent of BNC's "securities," also known as BNC's "equity."

---

[8] *See* **Exhibit 1**. BNC was founded on December 23, 1948 as the Central Bank of Cuba, and began functioning on its "own equity" in 1950. *See* National Bank of Cuba, *supra* n.6.

[9] *Id.*

[10] BNC purchased RBC for $8.8 million, $1.3 million more than RBC's book value in 1958. *Id*. *See also* Canadian Coin News, *OTD: RBC, Bank of Nova Scotia Stay in Cuba After Sweeping Nationalization Decrees*, available at: https://canadiancoinnews.com/rbc-bank-of-nova-scotia-remain-in-cuba-after-sweeping-nationalization-decrees-1960/ (last visited September 8, 2019).

[11] Banco Nuñez's claim to the equity of BNC is analogous to the ownership structure of the National Bank of Belgium ("NBB"), which was established in 1850 using private capital alone. In 2019, fifty percent of NBB's shares remain publicly held, with public shareholders entitled to dividends and voting rights. *See* National Bank of Belgium, *Market Releases*, available at: https://www.nbb.be/en/about-national-bank/shareholder-information/market-releases-0 (last visited May 30, 2019).

[12] Helms-Burton defines "Property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein." 22 U.S.C. § 6023(12)(A).

10.     In addition to the theft of Plaintiff's business enterprise, BNC also stole Banco Nuñez's physical assets. In December 1959, Banco Nuñez had $9.9 million in cash deposited at BNC—BNC confiscated the entire amount on October 14, 1960.[13]  Plaintiff has never been compensated by BNC or the Cuban Government for the loss of this cash.

11.     Moreover, Banco Nuñez held at least $194,900 in shares of BNC on December 31, 1959. BNC confiscated those shares on October 14, 1960,[14] and Plaintiff has never been compensated by BNC or the Cuban Government for its equity interest in BNC. Accordingly, Plaintiff also maintains a direct claim on the equity of BNC.

12.     The Defendants are liable to Plaintiff for "trafficking"[15] because they conduct commercial activities with BNC and derive profits therefrom.[16]

13.     For example, on December 11, 1995, BNC granted SocGen a license to conduct "for-profit activities related to" banking in Cuba.[17] In or around 2000, SocGen created a system of "credit facilities" to enable BNC to circumvent the United States' economic embargo of Cuba. SocGen's system involved concealing and processing BNC's transactions with foreign corporations, and in exchange for this service, SocGen received over $1 billion in profit.

---

[13] *See* Banco Nuñez's December 31, 1959, balance sheet attached hereto as **Exhibit 2**. The 1959 balance sheet is an even more close approximation to Banco Nuñez's financial composition at the time of confiscation on October 14, 1960.

[14] *Id*.

[15] An entity "traffics" in confiscated property if it knowingly and intentionally (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property or purchases, leases, receives, possesses, obtains, control of, manages, uses, or otherwise acquires or holds an interest in confiscated property, (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or (iii) causes, directs, participates in, or profits from trafficking, without the authorization of the United States National who holds a claim to the property. *See* 22 U.S.C. §§ 6082 and 6023(13).

[16] *See* 22 U.S.C. § 6082.

[17] *See* Gaceta Oficial, December 11, 1995, Resolution Number 329 of 1995, attached hereto as **Exhibit 3**.

5

14.     Through this "credit facility" system, SocGen "knowingly and willfully" violated the Trading with the Enemy Act ("TWEA"), 50 U.S.C. §§ 4303, 4305, and 4315(a), and the Cuban Assets Control Regulations ("CACR"), 31 C.F.R. §§ 515.201(a)(1), (c), and (d), promulgated under the TWEA.[18] SocGen's facilities "provided funding to a Cuban government bank," BNC, "to Cuban government-controlled corporations, and to European corporations in connection with their Cuban business enterprises. The facilities included loans secured by Cuban tax revenues, sugar, oil, and nickel."[19] SocGen trafficked in Plaintiff's property by, and on behalf of, BNC, processing transactions worth over $15 billion through SocGen's Cuban credit facilities.[20] By engaging in commercial activity with BNC, SocGen received a profit of $1.34 billion.[21]

15.     BNC and Banco Central de Cuba similarly granted licenses to Defendants Scotiabank, NatBC, and BBVA to establish credit facilities and to conduct commercial banking activities in Cuba.[22] Scotiabank, NatBC, and BBVA maintain offices in Cuba[23] and provide lending and credit facility services to BNC and the Cuban Government.

16.     Because Banco Nuñez retains a claim to ten-and-one-half percent of BNC, the Defendants' activities constitute "trafficking" in Banco Nuñez's "property," as defined by Helms-Burton.

---

[18] *See* Verified Complaint for Forfeiture, *U.S. v. $717,200,000 in U.S. Currency*, Case No.: 18-cv-10783 (S.D.N.Y.), [DE 1, ¶¶ 4, 6], attached hereto as **Exhibit 4**.

[19] *See* **Exhibit 4**, [DE 1-1, Exhibit C, ¶ 21].

[20] *See* **Exhibit 4**, [DE 1-1, Exhibit C, ¶¶ 22, 23, 25].

[21] *See* **Exhibit 4**, [DE 1-1, Exhibit 1, ¶ 4].

[22] *See e.g.* Gaceta Oficial, December 29, 2011, Resolution Number 118 of 2011, attached hereto as **Exhibit 5**.

[23] *See e.g.* Scotiabank, *Cuba*, available at: https://www.scotiabank.com/global/en/country/cuba.html (last visited September 10, 2019).

17.    Plaintiff seeks monetary damages, including treble damages,[24] and court costs and attorneys' fees from the Defendants for trafficking in the assets of Banco Nuñez in violation of Title III of Helms-Burton.

## PARTIES AND RELEVANT NONPARTIES

18.    Plaintiff, Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc., d/b/a Banco Nuñez, is a Florida corporation. The Founders owned one-hundred percent of the equity of Banco Nuñez as it existed on December 31, 1958. Founder Carlos Nuñez, who was preceded in death by his wife, Pura Galvez, became a United States citizen before he passed away on October 31, 1979. In 1996, the Founders' children and their families created Plaintiff to consolidate, unify and hold one-hundred percent of the claim associated with Banco Nuñez—all of which has been inherited from Founders Carlos Nuñez and Pura Galvez, as well as from Founder Carlos Nuñez's second wife, Caridad Maria Rivero Caballero.

19.    The Founders also owned one-hundred percent of the equity of Inmobiliaria Norka, S.A., which held the land on which Banco Nuñez built its branches. One-hundred percent of the Founders' claim associated with Inmobiliaria Norka, S.A., has been consolidated and unified into Plaintiff.

20.    Defendant Société Générale, S.A., is a French multinational bank and financial services company headquartered in Paris, France. Société Générale, S.A. is traded on the exchange Euronet N.V. under the ticker symbol "GLE." Société Générale, S.A. does business in the United States as SG Americas, Inc., a Delaware corporation with its headquarters at 245 Park Avenue, New York, New York 10167. Since 1993, Société Générale, S.A. has sold American

---

[24] Defendants received Plaintiff's demand letters, as required by 22 U.S.C. § 6082(a)(3), no later than June 10, 2019. The original complaint against SocGen was filed thirty days thereafter; Defendants Scotiabank, NatBC, and BBVA were not named as defendants in the original Complaint.

Depository Receipts ("ADRs") in the United States under the ticker symbol "SCGLY" through Bank of New York Mellon.[25]

21.     Defendant The Bank of Nova Scotia is a Canadian multinational bank and financial services company headquartered in Toronto, Canada. The Bank of Nova Scotia is traded on the Toronto Stock Exchange under the ticker symbol "BNS." The Bank of Nova Scotia does business in the United States as Scotia Holdings (US) Inc., a Delaware corporation with its headquarters at 250 Versey St., 23rd & 24th Floors, New York, New York, 10281. The Bank of Nova Scotia does business in Florida as The Bank of Nova Scotia, Miami Agency, which has its principal place of business at 201 Biscayne Blvd., #1320, Miami, Florida 33131. The Bank of Nova Scotia is traded on the New York Stock Exchange under the ticker symbol "BNS."

22.     Defendant The National Bank of Canada is a Canadian multinational bank and financial services company headquartered in Montreal, Canada. The National Bank of Canada is traded on the Toronto Stock Exchange under the ticker symbol "NA." The National Bank of Canada does business in the United States as National Bank of Canada Financial Group Inc., a Delaware corporation with its headquarters at 65 E. 55th Street, 8th Floor, New York, New York 10022. The National Bank of Canada is traded over-the-counter in the United States under the pink sheet listing "NTIOF."

23.     Defendant Banco Bilbao Vizcaya Argentaria, S.A. is a Spanish multinational bank and financial services company with dual headquarters in Madrid and Bilbao, Spain. Banco Bilbao Vizcaya Argentaria, S.A. is traded on the exchange Bolsa de Madrid as "BBVA." Banco Bilbao Vizcaya Argentaria, S.A. does business in the United States as BBVA, USA, an Alabama corporation with its headquarters at 15 S. 20th Street, Birmingham, Alabama 35233. Banco

---

[25] *See* Societe Generale, *Share Capital*, available at: https://www.societegenerale.com/en/measuring-our-performance/information-and-publications/share-capital (last visited September 8, 2019).

Bilbao Vizcaya Argentaria, S.A. is traded on the New York Stock Exchange under the ticker symbol "BBVA."

24.     The Republic of Cuba, a nonparty to this case, is a sovereign state composed of the island of Cuba, as well as Isla de la Juventud and several minor archipelagos. In May 1959, the Cuban Agrarian Reform Law began the process of expropriating property from private ownership into the hands of the Cuban Government. Law No. 851 gave Fidel Castro and Osvaldo Doritcós Torrado the power to decree joint resolutions to nationalize American properties in Cuba by compulsory expropriation. Law No. 890 established the Cuban nationalization of companies dealing in sugar, spirits, beverages, soap, perfume, milk products, chemicals, maritime transportation, railway communications, coffee, and drugs, among other industries, irrespective of the owners' nationality. Law No. 891 declared banking a public function, while Law No. 1076 nationalized small retail forms of commerce, also irrespective of the former owners' nationality.

25.     Banco Nacional de Cuba, a nonparty to this case, is an alter ego of the Republic of Cuba.[26] On October 14, 1960, Banco Nacional de Cuba nationalized Banco Nuñez without paying any compensation to the Founders. Between 2000 and 2014, Banco Nacional de Cuba and SocGen conducted business activities, including the maintenance and operation of several credit facilities, which generated over $1 billion in profit for SocGen. SocGen continues to derive profits from Banco Nacional de Cuba by providing currency conversion services through Banco Nacional de Cuba's affiliate Banco Popular de Ahorro.[27] Upon information and belief, SocGen continues to profit from Euro-denominated credit facilities established for BNC.

---

[26] *See Banco Nacional de Cuba*, *supra* n.6.

[27] *See* EcuRed, *Banco Popular de Ahorro*, available at: https://www.ecured.cu/Banco_Popular_de_Ahorro (last visited September 12, 2019).

Scotiabank, NatBC, and BBVA presently conduct commercial activities with BNC, including the maintenance of credit facilities for the benefit of BNC.

## JURISDICTION AND VENUE

26.     Plaintiff is a Florida corporation located at 9700 NW 79th Avenue, Hialeah Gardens, Florida 33016. A United States national, Plaintiff has been the victim of confiscation by the Cuban Government, and is "endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures."[28]

27.     Defendant Société Générale, S.A., is a multinational bank headquartered at 29 Blvd. Haussman, 9th Arrondissement, Paris, France. Société Générale, S.A. does business in the United States through its wholly owned subsidiary SG Americas, Inc., headquartered at 245 Park Avenue, New York, New York 10167. Société Générale, S.A. and SG Americas, Inc., share a unity of corporate interest and operate as part of a single enterprise, which is advanced by profits derived from Cuba, the United States, and other countries around the world. In its Federal Reserve Resolution Plan, Société Générale, S.A. identifies SG Americas, Inc., as a Material Entity through which its core business is conducted.[29]

28.     Defendant The Bank of Nova Scotia is a multinational bank headquartered at 44 King Street West, Toronto, Ontario, M5H 1H1, Canada. The Bank of Nova Scotia does business in the United States through its wholly owned subsidiary, Scotia Holdings (US) Inc., headquartered at 250 Versey St., 23rd & 24th Floors, New York, New York, 10281, and in Florida as The Bank of Nova Scotia, Miami Agency, with its headquarters at 201 Biscayne Blvd., #1320,

---

[28] 22 U.S.C. § 6081(11).

[29] *See* *2015* *U.S.* *Resolution* *Plan*, Société Générale, at 2-3, available at: https://www.federalreserve.gov/bankinforeg/resolution-plans/societe-generale-3g-20151231.pdf (last visited September 8, 2019).

Miami, Florida 33131. The Bank of Nova Scotia, Scotia Holdings (US), Inc., and The Bank of Nova Scotia, Miami Agency, share a unity of corporate interest and operate as part of a single enterprise, which is advanced by profits derived from Cuba, the United States, and other countries around the world.  In its Federal Reserve Resolution Plan, The Bank of Nova Scotia identifies: The Bank of Nova Scotia New York Agency, The Bank of Nova Scotia Houston Branch, and Scotia Capital (USA) Inc., as Material Entities through which its core business in conducted.[30]

29.     Defendant The National Bank of Canada is a multinational bank headquartered at 600 De La Gauchetière Street West, 4th Floor, Montreal, Quebec, H3B 4L2, Canada. The National Bank of Canada does business in the United States through its wholly owned subsidiary, National Bank of Canada Financial Group, Inc., headquartered at 65 E. 55th Street, 8th Floor, New York, New York 10022. The National Bank of Canada and The National Bank of Canada Financial Group, Inc., share a unity of corporate interest and operate as part of a single enterprise, which is advanced by profits derived from Cuba, the United States, and other countries around the world. In its Federal Resolution Plan, The National Bank of Canada identifies its New York Branch as a Material Entity through which its core business is conducted.[31]

30.     Defendant BBVA, S.A., is a multinational bank headquartered at Plaza San Nicolás, 4 – 48005 Bilbao, Spain. BBVA, S.A. does business in the United States through its wholly owned subsidiary BBVA, USA, headquartered at 15 S. 20th Street, Birmingham, Alabama 35233. BBVA, S.A. and BBVA, USA share a unity of corporate interest and operate as

---

[30] *See U.S. Resolution Plan Public Summary*, The Bank of Nova Scotia, December 20, 2018, available at: https://www.fdic.gov/regulations/reform/resplans/plans/bns-165-1812.pdf (last visited September 10, 2019).

[31] *See 165(d) Resolution Plan Part A Public Section*, The National Bank of Canada, December 31, 2016, available at: https://www.fdic.gov/regulations/reform/resplans/plans/nbc-165-1612.pdf (last visited September 10, 2019).

part of a single enterprise, which is advanced by profits derived from Cuba, the United States, and other countries around the world. In its Federal Reserve Resolution Plan, BBVA, S.A. identifies its United States subsidiary BBVA Compass Bancshares, Inc., as a Material Entity through which its core business is conducted.[32]

31.     This Court has federal question jurisdiction over this matter in accordance with 28 U.S.C. § 1331 because Plaintiff brings a claim for relief pursuant to the Helms-Burton Act, 22 U.S.C. § 6021, *et seq*. To deter trafficking in wrongfully confiscated property, United States nationals, including Plaintiff, who were the victims of those confiscations are endowed with a judicial remedy in the District Courts of the United States to deny traffickers any profits from economically exploiting Castro's wrongful seizures.[33]

32.     Personal jurisdiction over the Defendants is appropriate on the basis of the Defendants' national contacts, including, but not limited to, Defendants' sale of stock, ADRs, and over-the counter securities in the United States. Plaintiffs' claim rests on Helms-Burton, a federal statute authorizing the prosecution of claims in the United States for conduct outside of the territory that has a substantial effect within the United States.[34]

33.     Since the creation of Helms-Burton in 1996, Defendants have been on notice that their Cuban business activities would result in the possibility of a lawsuit in a United States District Court.[35] Yet, despite that knowledge, Defendants commenced financial activities in Cuba

---

[32] *See U.S. Resolution Plan*, Banco Bilbao Vizcaya Argentaria, S.A., December 31, 2015, available at: https://www.fdic.gov/regulations/reform/resplans/plans/bbva-idi-1512.pdf (last visited September 8, 2019).

[33] *See* 22 U.S.C. § 6081(11).

[34] "International law recognizes that a nation has the ability to provide for rules of law with respect to conduct outside its territory that has or is intended to have substantial effect within its territory." 22 U.S.C. § 6081(9).

[35] Prior to the enactment of Helms-Burton, the "international judicial system … [lacked] fully effective remedies for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property." 22 U.S.C. § 6081(8).

after March 12, 1996. SocGen created its system of "credit facilities" to enable BNC to circumvent the United States' economic embargo of Cuba in 2000. Scotiabank applied for and received a license from the Cuban Government to conduct banking operations in Cuba beginning on December 29, 2011. NatBC conducts its Cuban operations from its Miramar Trade Center office in Havana, a complex built after 1996. BBVA applied for and a received a license from the Cuban Government to conduct banking operations in Cuba beginning on August 22, 2000.

34.     To this day, Defendants continue to profit from business activities with BNC—a monetary benefit that would have flowed to Plaintiff, which is based in Miami, but for confiscation of Banco Nuñez by the Cuban Government in 1960.

35.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391. Because of the substantial number of potential Helms-Burton plaintiffs residing in Miami,[36] Defendants should reasonably have anticipated the possibility of a suit arising in the Southern District of Florida as a result of Defendants' Cuban-based business activities.

36.     Moreover, each of the Defendants either maintains physical office space in the Southern District of Florida or has ongoing commercial activities in this district. For example:

> i.     In 2016, SocGen provided $210 million in refinancing loans to the Ritz-Carlton in South Beach, Miami, Florida, and SocGen continues to generate interest revenue therefrom;[37]
>
> ii.    Scotiabank conducts banking operations from its office space at 201 Biscayne Boulevard, Suite 1320, Miami, Florida 33131;
>
> iii.   NatBC conducts banking operations from three South Florida branches: Hollywood, Pompano Beach, and Boynton Beach,[38] and

---

[36] The Miami metro area is home to 5.5 million people, 34.1% of which identify as Cuban. *See* World Population Review, *Miami, Florida Population 2019*, available at: http://worldpopulationreview.com/us-cities/miami-population/ (last visited September 10, 2019).

[37] Real Estate Capital, *Societe Generale and CCRE Provide $210m Refinancing of Miami Ritz-Carlton*, March 31, 2016, available at: https://www.recapitalnews.com/societe-generale-and-ccre-provide-210m-refinance-of-miami-ritz-carlton/ (last visited September 10, 2019).

its United States-based national bank, Natbank, N.A., is based in Hollywood, Florida;[39] and

iv.   BBVA conducts "commercial banking services in Miami," including finance and working capital loans, treasury management, and international services.[40]

## FACTUAL ALLEGATIONS

**I.   Plaintiff Owns a Claim Associated with Banco Nuñez.**

37.   Banco Nuñez commenced operations in 1921. Over the next forty years, the Founders grew Banco Nuñez into the second largest Cuban-owned bank on the island.[41] As of December 31, 1958, Banco Nuñez had twenty-two branches, $105.1 million in assets, including $51.5 million in loans, and equity of $7.8 million.[42]

38.   On December 31, 1958, Banco Nuñez owned branches, and the Founders through Norka, the land, located at:

i.   Mercaderes Nº 260, Havana (Banco Nuñez's headquarters);

ii.   Aguiar y Obrapia, Havana;

iii.   Maximo Gomez Nº 816, Havana;

iv.   10 do Octubre Nº 958, Havana;

v.   Terminal de Autobuses, Havana;

vi.   Calle 26 y 45, Havana;

---

[38] National Bank, *NATBANK: Your Bank in the United States*, available at: https://www.nbc.ca/en/about-us/our-organization/network-and-subsidiaries/subsidiaries/natbank.html (last visited September 10, 2019).

[39] *See 165(d) Resolution Plan Part A Public Section, supra* n.31.

[40] *See* BBVA, *Commercial Banking Services in Miami*, available at: https://www.bbvausa.com/commercial/relationship-manager-locations/miami.html (last visited September 10, 2019).

[41] *See* **Exhibit 1**.

[42] *Id.*

vii.     5ta. Avenida y Avda. 112, Havana;

viii.    Maceo Nº 853, Provincia de la Havana;

ix.     Cisneros Nº 224, Camagüey;

x.     Independencia Nº 152, Camagüey;

xi.     Florida, Camagüey;

xii.    Cespedes Nº 94, Matanzas;

xiii.    Independencia Nº 50, Matanzas;

xiv.    Maceo y Aguilera, Oriente;

xv.    Jose A. Saco Nº 170, Oriente;

xvi.    Vicente Garci Aguilera Nº 102, Oriente;

xvii.   Bayamo, Oriente;

xviii.  Gibara, Oriente;

xix.    Manzanillo, Oriente;

xx.    Guantanamo, Oriente;

xxi.    Palma Soriano, Santiago; and

xxii.   P. Vidal Nº 1, Las Villas.

39.     After fleeing Cuba in 1960, Founder Pura Galvez died in the United States in 1969. Founder Carlos Nuñez died in the United States on October 31, 1979. The Founders' one-hundred percent claim to the equity and assets of Banco Nuñez (and by extension, their claim to the equity of BNC) passed to their children, or *per stirpes* to the families of the Founders' children who had preceded them in death.[43]

---

[43] Founder Carlos Nuñez's second wife, Caridad Maria Rivero Caballero also inherited an interest in Banco Nuñez, and her interest passed to their only issue, Carlos Arsenio Nuñez Rivero.

40. The individuals who had inherited one-hundred percent of the equity of Banco Nuñez formed Plaintiff to hold and preserve a unified claim.

41. The individuals who transferred their interests in Banco Nuñez to Plaintiff are:

    i.    Nestor Nuñez Galvez;

    ii.    Blanca Nuñez Galvez;

    iii.    Dagmar Hidalgo Nuñez;

    iv.    Gloria Torralbas Nuñez;

    v.    Tomas Torralbas Nuñez;

    vi.    Pura America Ochoa Nuñez;

    vii.    Elsa Ochoa Molina;

    viii.    Norka Cabanas Nuñez;

    ix.    Carlos Cabanas Nuñez;

    x.    Silvia Nuñez Tarafa;

    xi.    Carlos Nuñez Tarafa;

    xii.    Alejandro Nunez Tarafa; and

    xiii.    Carlos Arsenio Nuñez Rivero.

42. As the holder of one-hundred percent of the equity of Banco Nuñez and Norka, and by extension, a claim to ten-and-one-half percent of the equity of BNC, Plaintiff is entitled to relief under Title III of Helms-Burton from any entity doing business with BNC—i.e. "trafficking" in Plaintiff's "property."

**II.    In 1959, the Value of Banco Nuñez Exceeded $50,000.**

43. On October 14, 1960, Banco Nuñez was worth at least $7.8 million.[44]

---

[44] *See* 22 U.S.C. § 6082(b).

44.     The Foreign Claim Settlement Commission ("FCSC") of the United States Cuban Claims Program certified a dollar value for analogous claims under the auspices of Title V of the International Claims Settlement Act of 1949, 22 U.S.C. § 1643, *et seq*. Employing reasoning from the FCSC's October 2, 1968 decision number CU-1615, because the Founders controlled one-hundred percent of Banco Nuñez's outstanding shares, the value of Plaintiff's claim can simply be calculated as Banco Nuñez's equity at the time of loss: $7.8 million in 1958.[45]

45.     The Founders were not eligible to file claims with the FCSC because they were not United States citizens at the time their property was confiscated.[46] Nonetheless, the value of Plaintiff's claim is well in excess of Helms-Burton's $50,000 threshold.

### III. Confiscation of Plaintiff's Property by the Cuban Government.

46.     On December 31, 1958, Banco Nuñez operated twenty-two physical locations, owned $105 million in assets, including $51.5 million in loans, and had equity of $7.8 million.[47] At the time of confiscation, Banco Nuñez represented roughly ten-and-one-half percent of the equity of all financial intuitions on the island, including bank operations controlled by foreign institutions.

47.     On October 14, 1960, the Cuban Government issued Law 891, immediately nationalizing all Cuban-owned banks on the island, including Banco Nuñez, and absorbing them into the Cuban Government's alter ego, BNC. [48]

---

[45] *See* analogous certified claim of Elmer E. and Isabel Keller, CU-1615, attached hereto as **Exhibit 6** (their shares of Industrial Bank could be valued by the bank's "owners' equity, or net worth," divided by the bank's outstanding shares as of December 31, 1959.).

[46] *See* 22 U.S.C. § 1643.

[47] *See* **Exhibit 1.**

[48] Shelton, *The Cuban Banking System*, *supra* n.4.

48.     Between October 14, 1960, and December 31, 1961, the Founders, their children, and their children's families fled Cuba and immigrated to the United States.

49.     The Castro regime confiscated Banco Nuñez's property without the Founders' consent. Today, the Cuban Government continues to maintain possession of Banco Nuñez's assets, including its physical branches, and upon information and belief, continues to conduct banking activity from those locations.

50.     Banco Nuñez was entirely absorbed into BNC and the Cuban Government failed to pay the Founders for any of Banco Nuñez's stolen property, including: the equity of Banco Nuñez, Banco Nuñez's $9.9 million in cash deposited at BNC, or Banco Nuñez's $194,900 worth of shares of BNC. BNC could have compensated the Founders either with cash or with equity in BNC. Therefore, Plaintiff asserts a claim for ten-and-one-half percent of the equity of BNC—an amount equivalent to the percentage of the Cuban banking industry controlled by Banco Nuñez at the time the entire industry was nationalized by BNC.

51.     Presently, BNC acts as conduit for the Cuban Government to conduct commercial activities with foreign corporations. Those transactions are processed through "credit facilities" provided by the Defendants—foreign financial institutions. Each transaction with BNC (Plaintiff's property) constitutes trafficking by the Defendants.

IV. **Enactment of the Economic Embargo of Cuba and Helms-Burton.**

52.     Since Fidel Castro seized power in Cuba in 1959, the Cuban Government has trampled on the fundamental rights of the Cuban people and confiscated the property of millions of its own citizen, thousands of United States nationals, and thousands more Cubans who claimed asylum in the United States as refugees because of Castro's persecution.[49]

---

[49] *See* 22 U.S.C. § 6081(3).

53.     The Cuban Government's wrongful confiscation or taking of property, and its subsequent exploitation of this property at the expense of the rightful owners, "undermines the comity of nations, the free flow of commerce, and economic development."[50] To deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations are, through Title III of Helms-Burton, "endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures."[51]

54.     Title III of the Helms-Burton Act provides that any person who traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to the United States national who owns a claim to that property for monetary damages.[52] "United States national" means any United States citizen or any other legal entity organized under the laws of the United States, or of any State.[53] A person "traffics" in confiscated property if that person knowingly and intentionally: (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses or otherwise acquires or holds an interest in confiscated property; (ii) engages in a commercial activity using or otherwise benefiting from confiscated property; or (iii) causes, directs, participates in, or profits from trafficking, or otherwise engages in trafficking.[54]

---

[50] 22 U.S.C. § 6081(2).

[51] 22 U.S.C. § 6081(11).

[52] *See* 22 U.S.C. § 6082(a).

[53] *See* 22 U.S.C. § 6023(15).

[54] *See* 22 U.S.C. § 6023(13).

55.     Banco Nuñez was confiscated on October 14, 1960. The Founders' children and their families inherited their interest in Banco Nuñez prior to March 12, 1996. To consolidate and preserve a unified claim, all of the Founders' children or their families transferred the claims associated with Banco Nuñez to Plaintiff. Plaintiff owns a claim to ten-and-one-half percent of the equity of BNC. Any company that profits from its dealings with BNC "traffics" in Plaintiff's "property."[55]

### V. SocGen Traffics in Plaintiff's Property.

56.     From at least 2000, up through and including 2010, SocGen knowingly and willfully violated the economic embargo of Cuba,[56] specifically the TWEA, 50 U.S.C. §§ 4303, 4305, and 4315(a), and the CACRs promulgated thereunder, including 31 C.F.R. §§ 515.201(a)(1), (c) and (d).[57]

57.     SocGen structured, conducted, and concealed transactions between Cuban banks, including BNC, other entities controlled by the Cuban Government, and foreign corporations.[58] These transactions were carried out through a series of "credit facilities" provided by SocGen's Natural Resources and Energy Financing department.[59]

---

[55] *See* 22 U.S.C. § 6082(a)(1).

[56] SocGen, "having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, employees, or others authorized to speak on its behalf, make any statement to any person outside of [SocGen], in litigation or otherwise, contradicting the Statement of Facts" or the Deferred Prosecution Agreement entered into with the United States Government on November 18, 2018. *See* **Exhibit 4** [DE 1-1, Exhibit 1, at ¶ 17].

[57] *See* **Exhibit 4**, [DE 1, ¶ 4].

[58] *See* **Exhibit 4**, [DE 1-1, Exhibit C, ¶ 12].

[59] *See Id*. at ¶¶ 6, 15.

58.     Each transaction between BNC and a third party constitutes trafficking in Plaintiff's expropriated property, and through its credit facilities, SocGen engaged in more than $10 billion worth of improper transactions.[60]

59.     As an example of how SocGen's credit facility system operated, in 2000, SocGen created two linked facilities to finance oil transactions between a Dutch commodities firm and Cuba Petróleo Union (a Cuban Government-owned corporation).[61] One of those two facilities was a $40 million revolving line of credit to finance the Dutch company's importation of crude oil into Cuba, where it was refined by Cuba Petróleo Union and sold to the local Cuban market.[62] The second linked facility was a $40 million revolving line of credit to finance the Dutch company's purchase of receivables owed to Cuba Petróleo Union from the sale of refined gasoline.[63]

60.     Between 2003 and 2010, SocGen engaged in at least 1,887 transactions involving the sale of crude oil and the subsequent purchase of affiliated receivables.[64] The aggregate dollar value of those transactions was at least $14,736,500,000.[65]

61.     During this same timeframe, SocGen maintained twenty additional credit facilities for the benefit of BNC, the Cuban Government, and foreign corporations doing business in Cuba.

---

[60] *Id.* at ¶ 6.

[61] *See* **Exhibit 4**, [DE 1, Exhibit C, ¶ 22].
[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

62.     Six of SocGen's facilities were composed of loans directly from SocGen to BNC. Three of those loans to BNC were secured by Cuban commodities, while the other three were repaid by a different Cuban bank, one of BNC's affiliates, using Cuban tax revenues.

63.     Another SocGen facility involved loans extended directly from SocGen to Cubana de Aviación (a Cuban state-owned corporation that operates Cuba's airlines).[66]

64.     Thirteen of SocGen's credit facilities involved loans to European corporations. These facilities allowed the European companies to finance the purchase, production, and/or export of Cuban commodities.[67]

65.     SocGen went to great lengths to conceal its trafficking (SocGen's "Concealment Practices"). For example, a January 2006 agreement involving a credit facility between SocGen and BNC expressly stated that the payments between SocGen and a Russian bank that was a sub-participant in the facility should be made through SocGen New York "without including any mention or reference to Cuba, any Cuban entity or to the Caribbean, either in the correspondence (electronic, paper or fax), the SWIFT messages or the fund transfer SWIFTS."[68] In another example, in July 2002, SocGen described a proposed credit facility involving a joint venture between a French commodities trading company and a Cuban Government entity as follows:

> We are going to receive transfer orders in USD in favor of certain suppliers in non-Cuban banks. In this case, the USD transfer must not in any case mention the name of the [the joint venture] or its country of origin, Cuba. The clearing will indeed be carried out in NY. I have explicitly asked [joint venture] to write on its transfer request the instructions to be included."[69]

---

[66] *Id. at ¶ 23.*

[67] *Id. at ¶ 23.*

[68] *Id.* at ¶ 36 (emphasis removed).

[69] *See* **Exhibit 4**, [DE 1, Exhibit, C, at ¶ 15] (emphasis removed).

66.     At some point in 2010, SocGen made a decision to cease U.S. dollar denominated credit facilities in Cuba, and to replace them with Euro-denominated facilities.[70] The new Euro-denominated facilities were created no later than October 2010,[71] and upon information and belief, SocGen continues to profit from Euro-denominated credit facilities created for BNC.

67.     Moreover, SocGen continues, to this day, to profit from doing business with BNC by performing currency conversion services for BNC's affiliate Banco Popular de Ahorro.[72]

68.     For Plaintiff's losses attributable to the Cuban Government's confiscation of Banco Nuñez, Plaintiff seeks damages from SocGen in accordance with § 6082(a) of Helms-Burton, including treble damages.[73]

## VI. Scotiabank Traffics in Plaintiff's Property.

69.     On December 29, 2011, the Central Bank of Cuba granted Scotiabank a license to "coordinate the granting of deposits, credits, loans, and other forms of credit facilities" in Cuba.[74] Scotiabank maintains an office at Miramar Trade Centre, Habana Building, Office 105, 3rd Avenue between 78 and 80, Miramar, La Habana, Cuba.[75]

70.     By letter dated August 31, 2011, Scotiabank Executive Vice-President and Chief Financial Officer Luc Vanneste admitted to the United States Securities and Exchange Commission ("SEC") that it conducts business in Cuba in the form of wire transfers through the

---

[70] *Id.* at ¶ 33.

[71] *Id.* at ¶ 39.

[72] *See* Banco Popular de Ahorro, *supra* n.28.

[73] SocGen received Plaintiff's thirty-day demand letter in conformance with 22 U.S.C. § 6082(a)(3)(B) and (D) on June 10, 2019.

[74] *See* **Exhibit 5.**

[75] *See* Scotiabank, *Cuba*, available at: https://www.scotiabank.com/global/en/country/cuba.html (last visited September 8, 2019).

Society for Worldwide Interbank Financial Telecommunications ("SWIFT") network.[76] Scotiabank disclosed, but publicly redacted, the number of wire payments it processes for Cuba and the amount of money Scotiabank is making by providing those services to BNC.[77]

71.     In 2018, Scotiabank reported net income attributable to equity holders of CA$2.6 billion from its international banking operations.[78] Upon information and belief, a portion of Scotiabank's international banking income is attributable to the business Scotiabank conducts in Cuba through BNC, including the operation of Canadian dollar-denominated credit facilities.

72.     For Plaintiff's losses attributable to the Cuban Government's confiscation of Banco Nuñez, Plaintiff seeks damages from Scotiabank in accordance with § 6082(a) of Helms-Burton, including treble damages.[79]

### VII.    NatBC Traffics in Plaintiff's Property.

73.     On January 20, 1995, Banco Nacional de Cuba granted NatBC a license to "coordinate the issue of deposits, credits, loans, and other forms of credit facilities" in Cuba.[80] NatBC maintains an office at Centro de Negocios Miramar, Edificio Jerusalén Ave. 3ra. e/ 78 y 80, Piso 4, Oficina 407, Miramar, La Habana, Cuba.

74.     NatBC's U.S. Specialty Finance and International segment encompasses "the activities of targeted investments in certain emerging markets."[81] This division generated

---

[76] *See* Scotiabank's Letter to the SEC, August 31, 2011, attached hereto as **Exhibit 7**.

[77] *Id*.

[78] Scotiabank, *Annual Reports*, available at: https://www.scotiabank.com/ca/en/about/investors-shareholders/annual-report-and-meeting.html (last visited September 8, 2019).

[79] Scotiabank received Plaintiff's thirty-day demand letter in conformance with 22 U.S.C. § 6082(a)(3)(B) and (D) on June 7, 2019.

[80] *See* Gaceta Oficial, January 20, 1995, Resolution Number 22 of 1995, attached hereto as **Exhibit 8**.

[81] NatBC, *2018 Annual Report*, available at: https://www.nbc.ca/content/dam/bnc/a-propos-de-nous/relations-investisseurs/assemblee-annuelle/2018/nbc-annual-report-2018.pdf (last visited September 13, 2019).

CA$222 million in 2018, and upon information and belief, a portion of that income was derived from NatBC's ongoing business activities with BNC, including the operation of Canadian dollar-denominated credit facilities.

75.     In fact, on May 28, 2019, after Title III of Helms-Burton became effective, NatBC spokesman Jean-Francois Cadieux "said in an e-mail that concerns [NatBC] would no longer provide [BNC] letters of credit were inaccurate,"[82] thus confirming that NatBC recognizes the liability it faces for trafficking in stolen property, but chooses to prioritize profits over justice for the victims of confiscation.

76.     For Plaintiff's losses attributable to the Cuban Government's confiscation of Banco Nuñez, Plaintiff seeks damages from NatBC in accordance with § 6082(a) of Helms-Burton, including treble damages.[83]

**VIII.   BBVA Traffics in Plaintiff's Property.**

77.     On August 22, 2000, Banco Nacional de Cuba granted BBVA a license to "coordinate the granting of deposits, credits, loans, and other forms of credit facilities" in Cuba.[84] BBVA maintains an office at 5ta Avenida, Número 4205, e/ 42 y 44, Miramar, La Habana, Cuba.[85]

---

[82] *See* Marc Frank, *Trump Crackdown May Have Thrown Wrench into U.S.-Cuba Food Trade*, Reuters, May 28, 2019, available at: https://ca.reuters.com/article/businessNews/idCAKCN1SY1I3-OCABS (last visited September 16, 2019).

[83] NatBC received Plaintiff's thirty-day demand letter in conformance with 22 U.S.C. § 6082(a)(3)(B) and (D) on June 7, 2019. In an abundance of caution, NatBC subsidiary National Bank of Canada Financial Group, Inc. also received a thirty-day demand letter from Plaintiff on September 12, 2019.

[84] *See* Gaceta Oficial, August 10, 2000, Resolution Number 57 of 2000, attached hereto as **Exhibit 9**.

[85] *See* BBVA, *The BBVA Group's Branch Network Abroad*, available at: https://shareholdersandinvestors.bbva.com/microsites/informes2010/en/Supplementaryinformation/TheBBVAGroup sbranchnetworkabroad.html (last visited September 13, 2019).

78.    On May 31, 2013, BBVA's Head of Global Accounting and Information Management Department, Ricardo Gómez Barredo, disclosed to the SEC that BBVA maintained an office in Havana, Cuba, to collect "payments from Banco Nacional de Cuba" related to a €5.4 million loan.[86] BBVA also represented that it "conforms letters of credit issued by Cuban banks in connection with the importation of goods to Cuba," which in 2013 resulted in an aggregate credit exposure to BBVA of €28.5 million.[87] Moreover, BBVA maintained deposits from Cuban banks in the amount of €139.1 million and acted as the correspondent bank with "seven Cuban government-controlled banks, one of which is authorized by the Cuban central bank to transfer currency outside of Cuba."[88] BBVA also "provides currency transfers services to the … authorized Cuban government-controlled bank and foreign exchange services to the aforementioned Cuban government-controlled banks."[89] Lastly, BBVA provides "wire transfers services in connection with transfers into Cuba and transfers originated in Cuba on behalf of our customers."[90]

79.    In BBVA's 2018 Annual Report, BBVA disclosed that it had at least one full-time employee in Cuba.[91] Upon information and belief, BBVA presently conforms letters of credit issued by BNC, earns a profit as a correspondent bank for BNC, engages in currency exchange services for BNC, and provides wire transfer services for BNC.

---

[86] *See* BBVA's Letter to the SEC, May 31, 2013, attached hereto as **Exhibit 10**.

[87] *Id*.

[88] *Id*. All Cuban government-controlled banks are affiliates of BNC and with direction and authority from BNC.

[89] *Id*.

[90] *Id*.

[91] BBVA, *2018 Annual Report*, available at: https://shareholdersandinvestors.bbva.com/wp-content/uploads/2019/02/4.Anual_Report_BBVA_S.A._2018.pdf (last visited September 13, 2019).

80.     For Plaintiff's losses attributable to the Cuban Government's confiscation of Banco Nuñez, Plaintiff seeks damages from BBVA in accordance with § 6082(a) of Helms-Burton, including treble damages.[92]

**TOLLING OR NON-ACCRUAL OF STATUTE OF LIMITATIONS**

81.     Upon information and belief, SocGen presently operates credit facilities for BNC denominated in Euros and continues to profit from other commercial activities with BNC, including currency conversion services performed for BNC's affiliate Banco Popular de Ahorro.

82.     Notwithstanding SocGen's continuing violations of Title III of Helms-Burton between 2000 and 2010, as admitted by SocGen, it knowingly and intentionally profited by trafficking in Plaintiff's confiscated property, while at the same time employing a variety of Concealment Practices to prevent discovery by OFAC and other regulatory agencies.[93]

83.     Plaintiff did not and could not have discovered the facts constituting SocGen's violations of Helms-Burton until the United States' complaint was made available to the public on November 19, 2018.

84.     SocGen concealed its own wrongdoing, and failed to even report its Cuban-derived profits to OFAC until October 2014.[94]

85.     Because Plaintiff could not have reasonably discovered the facts constituting Defendant's violations until November 19, 2018, their claims accrued on that date and all applicable statutes of limitations were tolled until that date.

---

[92] BBVA received Plaintiff's thirty-day demand letter in conformance with 22 U.S.C. § 6082(a)(3)(B) and (D) on June 7, 2019. In an abundance of caution, BBVA subsidiary BBVA, USA also received a thirty-day demand letter from Plaintiff on September 11, 2019.

[93] *Id.* at ¶ 14.

[94] *Id.* at ¶41.

**COUNT I**
**Liability for Trafficking According to Helms-Burton**
**(Against All Defendants)**

Plaintiff re-alleges and incorporates paragraphs 1-85 above as if fully set forth herein and further alleges as follows:

86.     Title III of the Helms-Burton Act provides that any person who traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for monetary damages.

87.     The Founders owned one-hundred percent of the equity of Banco Nuñez as it existed on December 31, 1958. When the Cuban Government confiscated Banco Nuñez on October 14, 1960, Banco Nuñez's fair value was at least $7.8 million. Upon confiscation of the entire Cuban banking industry, BNC had a fair value of approximately $74 million.

88.     Upon Founder Pura Galvez's death in 1969, and Founder Carlos Nunez's death in 1979, the claim to Banco Nuñez was inherited by their family. All of the family members who had inherited claims to Banco Nuñez from both Founders assigned their claims to Plaintiff to unify and hold the claim associated with Banco Nuñez.

89.     Banco Nuñez was entirely absorbed into BNC, and the Cuban Government failed to pay the Founders for the equity of Banco Nuñez, either with cash or with equity in BNC. Consequently, Plaintiff maintains a claim to ten-and-one-half percent of the equity of BNC—an amount equivalent to the percentage of the Cuban banking industry controlled by Banco Nuñez at the time the entire industry was nationalized by BNC.

90.     Between 2000 and 2010, through various credit facilities, SocGen processed thousands of transactions and earned hundreds of millions in dollars in fees by conducting commercial activities with BNC. SocGen generated at least $1.34 billion in profit from

"trafficking" – i.e. conducting commercial activities with BNC, the successor in interest to Banco Nuñez. After years of concealment, SocGen's trafficking in Banco Nuñez's expropriated property became public knowledge on November 19, 2018.

91.     Plaintiff seeks to hold SocGen accountable under Title III of Helms-Burton for actions that resulted in the United States Department of Justice finding SocGen liable under the TWEA and CACR. Moreover, Plaintiff seeks to hold SocGen liable under Title III of Helms-Burton for continuing to conduct Euro-denominated transactions with BNC and for providing currency conversion services to BNC's affiliate Banco Popular de Ahorro.

92.     Scotiabank earned $2.5 billion from its international banking division in 2018, which includes a portion of revenue derived from Scotiabank's Cuban-based operations. Upon information and belief, Scotiabank presently conducts business in Cuba by, among other activities, processing wire transfers for BNC. By conducting commercial activities with BNC, Scotiabank is trafficking in Plaintiff's property.

93.     NatBC's emerging markets division generated CA$222 million in revenue in 2018. Even after Title III of Helms-Burton became effective on May 2, 2019, NatBC admits that it continues to provide financial services to BNC. NatBC presently conducts business in Cuba, and by conducting commercial activities with BNC, NatBC is trafficking in Plaintiff's property.

94.     BBVA conforms letters of credit issued by BNC, earns a profit as a correspondent bank for BNC, engages in currency exchange services for BNC, and provides wire transfer services for BNC. By presently conducting business in Cuba, and by conducting commercial activities with BNC, BBVA is trafficking in Plaintiff's property.

95.     Plaintiff provided a thirty-day notice to each Defendant stating Plaintiff's intention to commence this action and demanding that each Defendant's unlawful trafficking

cease immediately.[95] As of the date of this Amended Complaint, the Defendants continue their unlawful trafficking in Plaintiff's property by conducting commercial activities with BNC.

Accordingly, Plaintiff respectfully requests that the Court: (1) enter a judgment against the Defendants for monetary damages in accordance with § 6082(a), including the $7.8 million value of the property when confiscated plus 6% interest compounded annually from the date of confiscation through July 10, 2019, and treble damages; (2) award Plaintiffs' attorneys' fees and costs in accordance with § 6082(a)(1)(A)(ii); and (3) for any further relief deemed appropriate by this Court.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

---

[95] *See* 22 USC § 6082(a)(3)(B) and 22 USC § 6082(a)(3)(D)(iii).

Dated: September 24, 2019.         Respectfully submitted,

**KOZYAK TROPIN & THROCKMORTON, LLP**
*Counsel for Plaintiff*
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

By: */s/ Javier A. Lopez*           
       Javier A. Lopez, Esq.
       Florida Bar No. 16727
       jal@kttlaw.com
       Stephanie M. Gomez, Esq.
       Florida Bar No. 112095
       sgomez@kttlaw.com
       Evan J. Stroman, Esq., CPA
       Florida Bar No. 118929
       estroman@kttlaw.com

**LAW OFFICES OF PAUL A. SACK, P.A.**
*Counsel for Plaintiff*
1210 Washington Ave., Ste. 245
Miami Beach, Florida 33139
Tel: (305) 397-8077
Fax: (305) 763-8057

By: */s/ Paul A. Sack*           
       Paul A. Sack, Esq.
       Florida Bar No. 363103
       paul@paulsacklaw.com
       ps1619@bellsouth.net
       Brandon R. Deegan, Esq.
       Florida Bar No. 117368
       deegan@paulsacklaw.com